# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JOHN C DE BACA,

      Plaintiff,

v.

                              No. 12-CV-698-BRB/RHS

MICHAEL R. MEISINGER,
MIZEL A. GARCIA,
GREGORY O. GALLEGOS,
PATRICK D. BROWN,
LORENZO L. MORA,
and ERIC KUEBLER,
in their individual capacities,

      Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MEISINGER AND GARCIA'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

**BALDOCK**, Circuit Judge.[*]

Defendants Michael Meisinger and Mizel Garcia are officers of the Albuquerque Police Department (APD).  Plaintiff John C De Baca filed this § 1983 action (together with pendent state law claims) alleging APD Defendants violated his Fourth Amendment rights.  The Court construes Plaintiff's complaint as raising three federal claims against APD Defendants.  First, APD Defendants caused Plaintiff to be seized unlawfully from his

---

[*]  Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

home.  Second, APD Defendants arrested Plaintiff without probable cause.  Third, APD Defendants omitted material information from charging documents, thereby prolonging Plaintiff's unlawful detention.  Currently before the Court is APD Defendants' motion for summary judgment on the basis of qualified immunity.[1]  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable officer would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted). In contrast to a standard motion for summary judgment, which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial, a motion based on qualified immunity imposes the burden on the plaintiff to show "both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation."  Green v. Post, 574 F.3d 1294, 1300 (10th Cir. 2009). Applying the appropriate legal standards, the Court concludes Plaintiff has carried his burden as to APD Defendant Meisinger on the complaint's first and second but not its third claim. The Court further concludes Plaintiff has not carried his burden as to APD Defendant Garcia in any respect.  Accordingly, the Court denies APD Defendant Meisinger qualified immunity on Plaintiff's first two claims, but otherwise grants APD Defendant Meisinger and Garcia's motion for summary judgment on the basis of qualified immunity.

---

[1]  On March 19, 2013, the Court denied Defendants Gallegos, Brown, Mora, and Kuebler's motion for summary judgment based on qualified immunity.  (Doc. # 50).  Those Defendants are deputies of the Bernalillo County Sheriff's Department.

*Facts*

Viewed in the light most favorable to Plaintiff, the record supports the following facts. Anna Marie Santana, born in 1988, has an extensive history of reporting crimes to the APD. According to APD records, Santana first reported a crime at the age of nine.  Prior to July 5, 2010, Santana reported herself a victim of at least 28 separate crimes.  She reported being raped on six different occasions, most recently in 2007.  She reported being the victim of another "sexual offense" on three occasions.  She reported being the victim of other violent crimes on at least eleven occasions.  These alleged crimes involved four reports of aggravated battery, two reports of aggravated assault, two reports of a family fight, one report of simple assault, one report of stabbing, and one report of kidnapping.  Nothing in the record indicates whether any of Santana's criminal reports resulted in a conviction.

Around 9:30 p.m. on July 5, 2010, less than one year after she reported being the victim of a kidnapping, Santana called 911 yet again.  At approximately 9:50 p.m., Santana reported to Defendant Meisinger, the responding officer, that her "ex-boyfriend" John C De Baca and an unidentified man had grabbed her in an alley near Presbyterian Hospital around 9:00 p.m.  Santana told Defendant Meisinger that Plaintiff placed a handgun to her temple and told her "if you testify against me, I will kill you, your boyfriend, and your family."  Defendant Meisinger never asked Santana why she was scheduled to testify against Plaintiff and she never told him.[2]

---

[2] While paragraph thirteen of Defendant Meisinger's affidavit states Plaintiff, at the time of Santana's July 5 report, was the subject of pending charges of stalking (continued...)

Santana described Plaintiff as a 30 year old hispanic male with brown hair and a "South Side Locos" tattoo on the back of his neck.  Santana further reported Plaintiff was wearing a white polo shirt and black pants, and driving a black truck.  According to Defendant Meisinger's affidavit, "Ms. Santana informed me that she had disabilities and had a legal guardian.  She also requested that her current boyfriend be allowed to write out the witness statement because she was not good at spelling."  Defendant Meisinger did not ask Santana or her boyfriend about the nature of her disabilities or legal guardianship.  Nor did he ask the name of her legal guardian.

 "Based on the information learned from the victim," Defendant Meisinger contacted APD dispatch around 10:00 p.m.  Defendant Meisinger requested assistance from the Bernalillo County Sheriff's Department (BCSD) in attempting to "locate" Plaintiff at "1305 Bonita Southwest," a residence within Bernalillo County but outside Albuquerque city limits.  APD dispatch contacted BCSD dispatch and requested a "check [at] an address for a subject who had aggravated with a gun" (sic).  APD dispatch warned that BCSD should use caution because Plaintiff might be armed and dangerous.  At 10:06 p.m., BCSD sent a dispatch to all

---

[2](...continued)
and battery related to an earlier incident with Santana, Defendant Meisinger does not attest to when he learned of those charges.  Unlike the immediately preceding and succeeding paragraphs of his affidavit, which state "Santana told me" (¶¶ 9, 11), "Santana stated" (¶¶ 10, 12), and "Santana informed me" (¶ 14), paragraph thirteen makes no such representation. Defendant Meisinger then states in paragraph fifteen that he contacted BCSD through APD dispatch "[b]ased on the information learned from the victim."  Consequently, the Court finds for purposes of resolving the current motion that Defendant Meisinger did not know why Santana was set to testify against Plaintiff until Plaintiff told him subsequent to his arrest.

available deputies stating "c[hec]k to see if he is there and adv[ise] APD." At 10:13 p.m.,
BCSD sent another dispatch stating "if contact is made detain" and advise.

Four BCSD deputies, who are also named Defendants in this action, responded to
Defendant Meisinger's request. According to the affidavit of BCSD responding deputy
Lorenzo Mora: "Some time around 10 p.m. on July 5, 2010, the BCSD dispatcher advised
all available BCSD deputies that APD was requesting assistance in locating a suspect named
John C De Baca at 1305 Bonita Circle SW. BCSD dispatch advised that if the individual
was located, BCSD should detain him and advise the APD." BCSD responding deputies Eric
Kuebler and Patrick Brown also attest they were instructed to detain Plaintiff and APD would
respond. At 10:31 p.m., BCSD advised APD that Plaintiff was in custody. Defendant
Meisinger was still with Santana when he learned BCSD had taken Plaintiff into custody.
Defendant Meisinger conducted no further investigation of Santana's criminal report between
the time he initially interviewed Santana around 9:50 p.m. and the time he departed for
Plaintiff's residence shortly after 10:30 p.m.

In its prior order denying BCSD deputies' motion for summary judgment on the basis
of qualified immunity, the Court set out the facts (viewed in the light most favorable to
Plaintiff) surrounding the deputies' unconstitutional seizure of Plaintiff from his home.
See supra n.1. Those facts need not be detailed here. Suffice it to say, BCSD deputies
ordered Plaintiff from his home at gunpoint,  handcuffed him, and placed him in a BCSD
squad car to await APD's arrival. Contrary to Santana's description, Plaintiff was wearing
blue jeans and a tank top when seized from his home. He was 48 years old. Plaintiff did not

have a  "South Side Locos" tattoo on the back of his neck or anywhere else.  A white minivan was parked in his driveway.

Defendant Meisinger arrived at Plaintiff's residence around 11:00 p.m.  According to Plaintiff's affidavit:

14.    After some time, an APD officer came, took me out of the deputy's vehicle, put his handcuffs on me, and read me my rights.  He then asked me if I knew an "Anna Marie."  I said I did, because she had made an earlier false accusation that I was stalking her, and I had a hearing on that charge the following day.

15.    Only after that did I learn for the first time that I was being accused of kidnapping Anna Marie Santana at gun point.

16.    I explained to the officer that it was impossible for me to have seen Ms. Santana that day, since I had been at Cochiti Lake all day, then at Cinthia's [Plaintiff's then girlfriend] Aunt Julia's house until just minutes before the officers were knocking at my door.

17.    I attempted several times to provide the officers with the time line of my day's activities, as well as the names and phone numbers of several of the people I was at the lake with, including [nine named individuals].

18.    I also attempted to provide the officers with the address of the home I had been at during the time I was alleged to have been assaulting Anna Marie Santana, as well as the names of all those who saw me there.

19.    I also attempted to show the officers photographs that I had taken at the lake that day.

20.    Despite my efforts to provide the police that arrested me with information that would entirely exonerate me, the officers refused to take the information I tried to provide or to contact the witnesses.

21.    I also informed the officers that Anna Marie Santana had previously made a false accusation against me.

22.     I also explained to the officers that I was never in a romantic relationship with Anna Marie Santana, but that I had lived near her while she was growing up, that she was approximately 28 years my junior, and that I was close to her mother, Marcie Santana, and her sister Rose.

23.     I was then transferred to an APD vehicle, to be transported . . . . While I was in the APD vehicle, we passed Edith, the street where Cinthia's Aunt Julia lived and where I had been most of the evening.  I asked the officer to drive to the house to confirm my alibi, and he refused.

During their initial conversation, Defendant Meisinger asked Plaintiff if he owned any weapons.  Plaintiff initially responded no because he was "scared," but promptly retracted "because he wanted to be honest," and stated he owned a rifle and a handgun.

Defendant Meisinger also spoke with Cinthia Nieto:

Ms. Nieto was at Plaintiff's residence at the time he was detained.  Ms. Nieto told me that Plaintiff had been with her at Cochiti Lake on July 5, 2010 and had accompanied her to Ms. Nieto's aunt's home.  Ms. Nieto stated that they left the lake about 7:00 [p.m.] when it closes and then went to her aunt's house for an hour or two.  Ms. Nieto did not remember how long exactly they were at her aunt's house. . . .  She did tell me that she was with Plaintiff "the whole time."

By this point, apparently some doubt had arisen in Defendant Meisinger's mind about the veracity of Santana's July 5 report because he states "he went back to speak with Ms. Santana."  According to Defendant Meisinger's belt tape, the following exchange took place:

MEISINGER:      Are you sure that was him, absolutely positive?
SANTANA:        (No audible response)
MEISINGER:      Okay.  See the problem we're running into is, . . . I went down and I talked to him, and every minute of his day . . . is accounted for.
SANTANA:        (Inaudible) Positive?
MEISINGER:      Positive.  Okay.  Just—the story that I'm

<div style="margin-left: 2em;">

| | |
|---|---|
| | getting from him and from a bunch of other people was, they were out of town, they got back in town, they all went to one person's house, a family member's house, and they were there for, you know, the time when they got there, about 8:00 [p.m.], and they didn't leave until just a little while ago, when the sheriff's department caught up, they said they drove up to the house. |
| SANTANA: | (Inaudible). |
| MEISINGER: | That was him? You're absolutely positive that was him? |
| SANTANA: | Yeah. |

</div>

<center>* * *</center>

<div style="margin-left: 2em;">

| | |
|---|---|
| MEISINGER: | Okay, I just wanted to make sure that, you know, one more time, that you're sure that was him and that wasn't one of his friends acting on his behalf or anything like that. But that was him? |
| SANTANA: | Yeah. |

</div>

<center>* * *</center>

<div style="margin-left: 2em;">

| | |
|---|---|
| MEISINGER: | All right. Well he's going to go to jail tonight, okay? |

</div>

In addition to the already pending charges of stalking and battery, see supra n.2, Plaintiff, as a result of Santana's July 5, 2010 criminal report, was charged with aggravated assault, kidnapping, and intimidation of a witness, in violation of the New Mexico penal code. Although Plaintiff bonded out the day after his initial arrest, bond was raised at his arraignment from $25,000 to $100,000. Unable to post bond, Plaintiff remained incarcerated for the next two weeks. Some time later, the prosecution dismissed with prejudice all charges against Plaintiff. Because Plaintiff has presented no evidence suggesting Defendant Garcia was involved in the incident forming the basis of the charges against Plaintiff,

<center>8</center>

Defendant Garcia is entitled to qualified immunity for lack of proof.  Thus, the Court's discussion focuses solely on the conduct of Defendant Meisinger.

<div align="center">*Claim 1–Initial Seizure*</div>

Defendant Meisinger argues probable cause and exigent circumstances justified Plaintiff's initial seizure from his home.  In its order of March 19, 2013, the Court addressed the question of whether BCSD deputies unlawfully seized Plaintiff from his home.  For the reasons stated therein, the Court held (1) exigent circumstances did not justify BCSD deputies warrantless seizure of Plaintiff, and (2) a reasonable officer cognizant of the law would have understood that.  The Court pointed out that whether a warrantless seizure out of the home amounts to an arrest or investigative detention is unimportant.  United States v. Reeves, 524 F.3d 1161, 1166 (10th Cir. 2008).  The question of probable cause was a non-issue because to justify a warrantless seizure out of the home, both probable cause *and* exigent circumstances must exist.  Storey v. Taylor, 696 F.3d 987, 992 (10th Cir. 2012).

With the Court's order conveniently in hand, Defendant Meisinger argues for the first time in his reply brief that because he could not have foreseen BCSD deputies would seize Plaintiff from his home, he could not have caused Plaintiff's initial constitutional deprivation. The Court deems this belated argument forfeited.  To permit Defendant Meisinger to raise a new argument in a reply brief is unfair to Plaintiff, who under applicable rules has had no opportunity to respond.  Moreover, an argument raised for the first time in a reply brief deprives the Court of the benefits of the adversarial process.  See Hill v. Kemp, 478 F.3d 1236, 1250–51 (10th Cir. 2007).

Nevertheless, to assist review in the event of an appeal, the Court will briefly address and reject the merits of Defendant Meisinger's belated argument.  The Tenth Circuit recently addressed the law of causation in relation to § 1983 claims:

> Section 1983 imposes liability on a government official who subjects, or causes to be subjected, any citizen to the deprivation of any rights. . . .  The requisite causal connection is satisfied if defendant[] set[s] in motion a series of events that defendant[] knew or reasonably should have known would cause others to deprive plaintiff[] of [his] constitutional rights.  Indeed, section 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.

Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012) (internal brackets, capitalization, citations, and ellipses omitted).

In this case, Defendant Meisinger acknowledges that he asked BCSD deputies via APD and BCSD dispatch to "locate" Plaintiff at his residence.  Defendant Meisinger described Plaintiff as a potentially armed and dangerous criminal suspect who had placed a gun to a woman's head.  Based on the BCSD dispatch records and affidavits of BSCD deputies described above, a factfinder could readily infer that the express directive to "detain" Plaintiff if located at his residence originated with APD and in particular Defendant Meisinger.  After all, law enforcement does not "locate" a possibly armed individual suspected of just committing a violent crime by knocking on his door and asking him to stay put so that he can be arrested shortly.  Nor does law enforcement "locate" a criminal suspect by staking out his residence without determining whether he is in the home.  A factfinder could conclude based on the evidence that a reasonable officer would have foreseen BCSD deputies would seize Plaintiff from his home.  Defendant Meisinger set in motion a series of

10

events that he reasonably should have known would result in Plaintiff's seizure contrary to clearly established law.

*Claim II–Arrest*

Defendant Meisinger contends "that he reasonably relied upon the information provided to him by Ms. Santana to form the basis for the probable cause to arrest Plaintiff." Defendant Meisinger formally arrested Plaintiff immediately upon arriving at Plaintiff's residence.  In <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1116 (10th Cir. 2007) (en banc), the Tenth Circuit held a plaintiff was subject to a full custodial arrest where officers (1) pulled him from the doorway of his home, (2) handcuffed him, (3) advised him of his Miranda rights, (4) placed him in the backseat of the patrol car, and (5) questioned him..  Those five factors are present in this case.  By the time Defendant Meisinger arrived, BCSD deputies had seized Plaintiff from his home at gunpoint, handcuffed him, and placed him in the backseat of a BCSD patrol car.  BCSD deputies had not Mirandized Plaintiff, nor had they questioned him.  BCSD deputies told Plaintiff they were merely detaining him pending APD's arrival.  Prior to any investigation and without a warrant, Defendant Meisinger removed Plaintiff from the BCSD patrol car, placed him in APD handcuffs, read him his Miranda rights, and began questioning him.

"A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime."  <u>Id.</u> at 1115 (internal quotations omitted).  "Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion."  <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th Cir. 2001).  Where the

underlying facts are in dispute, the Tenth Circuit has "long recognized that it is a jury question in a civil rights suit whether an officer had probable cause to arrest." DeLoach v. Bevers, 922 F.2d 618, 623 (10th Cir. 1990). In Beck v. Ohio, 379 U.S. 89, 91 (1964), the Supreme Court said the answer to this question turns on "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officer's] knowledge and of which [he] had *reasonably trustworthy information* were sufficient to warrant a prudent man in believing that the [plaintiff] had committed . . . an offense." (emphasis added). In other words, "[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be seized has committed . . . a crime." Manzanares v. Higdon, 575 F.3d 1135, 1144 (10th Cir. 2009) (internal brackets omitted) (quoting Cortez, 478 F.3d at 1116).

To be sure, "the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement is not trustworthy." Cortez, 478 F.3d at 1121. Yet, "a bare allegation of wrongdoing, without [further] investigation, in some circumstances may not give rise to probable cause." Id. at 1119. That is why the totality of the circumstances matters and why "the probable cause standard of the Fourth Amendment requires officers to interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d 1472, 1476–77 (10th Cir. 1995). "Police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that

12

investigation." Baptiste v. J.C. Penny Co., 147 F.3d 1252, 1259 (10th Cir. 1998).

In the course of receiving Santana's criminal report, Defendant Meisinger learned "she had disabilities and had a legal guardian" and did not wish to write a "witness statement because she was not good at spelling." Ignoring the red flag, Defendant Meisinger failed to "investigate basic evidence." Romero, 45 F.3d at 1476–77. Defendant Meisinger never asked Santana the nature of her disabilities or guardianship, though one or both might very well have borne upon her credibility. He did not ask her the name of her guardian. Moreover, Santana was with her boyfriend and unharmed when Defendant Meisinger responded to her 911 call. Santana's situation did not present an "on-the-scene" emergency requiring Defendant Meisinger to quickly assess Santana's credibility for the purpose of making an immediate arrest. See Ryburn v. Huff, 132 S. Ct. 987, 991–92 (2012). The record indicates Defendant Meisinger was with Santana for approximately thirty minutes after requesting the BCSD's assistance in locating Plaintiff. Because Santana had a legal guardian despite being of legal age, was unwilling to write her own personal statement, and was by neither parties' account physically incapacitated, a reasonable officer would have suspected Santana was mentally incapacitated to some yet undetermined degree.

BCSD deputies had detained Plaintiff outside his home when Defendant Meisinger arrived. Plaintiff was going nowhere. The record indicates, however, that Defendant Meisinger arrested and questioned Plaintiff before interviewing his girlfriend Cinthia Nieto or confirming Santana's description of Plaintiff. Among other things, Plaintiff told Defendant Meisinger he "had been at Cochiti Lake all day, then at Cinthia's Aunt Julia's

13

house until just minutes before the officers were knocking at my door." Plaintiff attempted to provide Defendant Meisinger a timeline of his day's events and the names and phone numbers of nine individuals who were with him at the lake. Nieto subsequently confirmed Plaintiff's version of events. She told Defendant Meisinger that she and Plaintiff had been at Cochiti Lake during the day. The two then stopped by her aunt's house that evening around 7:00 p.m before returning home an hour or two later. Nieto told Defendant Meisinger "she was with Plaintiff 'the whole time.'" Defendant Meisinger's failure to compare Santana's description of Plaintiff with his actual appearance, the most basic of evidence, also adds to the equation. Santana reported, among other inacurracies, that Plaintiff was 30 years old and had a "South Side Locos" tattoo on the back of his neck. Plaintiff was 48 years old and had no such tattoo on his neck or anywhere else. Santana also reported Plaintiff was her "ex-boyfriend." Surely Santana would know Plaintiff's age and physical characteristics.

So what does the totality of the circumstances surrounding Plaintiff's arrest reveal? First, Defendant Meisinger knew Santana suffered from disabilities and was under a legal guardianship, but failed to inquire. Second, Defendant Meisinger knew Plaintiff and Nieto provided the same innocent explanation as to Plaintiff's whereabouts prior to and during the commission of the reported crime. Third, Defendant Meisinger knew Santana described Plaintiff in readily verifiable facts, but again failed to inquire. Santana told Defendant Meisinger that Plaintiff was 30 years old and had a gang tattoo on the back of his neck, neither of which was true. Given these circumstances, did Santana provide Defendant Meisinger with reasonably trustworthy information sufficient to support Plaintiff's arrest?

14

On the record presented, the Court concludes Santana's criminal report did not establish probable cause to arrest Plaintiff because the information she provided Defendant Meisinger was not reasonably trustworthy.  Like the Tenth Circuit in Cortez, this Court

> make[s] no apologies for looking at what information [Defendant Meisinger] possessed against a backdrop of the known progress of [his] investigation, *including the steps that had not been taken at the time [Plaintiff] was arrested*. The sequence of the investigation that did [and did not] occur is plainly part of the facts in this case—and it is clear that [Defendant Meisinger] got ahead of [himself] insofar as arresting [Plaintiff].

Cortez, 478 F.3d at 1121 (emphasis added).  Viewing the facts in the light most favorable to Plaintiff, a factfinder could conclude Defendant Meisinger's conduct in arresting Plaintiff and hauling him off the jail violated the Fourth Amendment.  Prior to arresting Plaintiff, Defendant Meisinger acted contrary to clearly established Tenth Circuit precedent by failing to interview witnesses readily available at the scene, investigate basic evidence or "otherwise inquire if a crime ha[d] been committed at all before invoking the power of warrantless a arrest and detention."  Cortez, 478 F.3d at 1117 (quoting Romero, 45 F.3d at 1476- 77).  In short, Defendant Meisinger at the time he arrested Plaintiff did not have reasonably trustworthy information that Plaintiff had committed the crimes Santana reported, and a reasonable officer aware of the totality of the circumstances would have understood that.

### *Claim III-Continuing Detention*

Plaintiff's final claim is that Defendant Meisinger "is liable for the continuation of Plaintiff's detention, up through and including the two weeks he spent in [jail]."  Plaintiff says Defendant Meisinger did not have probable cause to arrest Plaintiff and subsequently

omitted material information from charging documents, thereby prolonging Plaintiff's unlawful detention.  The Court has held a factfinder could conclude Defendant Meisinger arrested Plaintiff without probable cause.  Assuming such a finding, Defendant Meisinger undoubtedly is responsible for causing Plaintiff's initial detention.  The Court has already explained § 1983 imposes liability on a government official who causes an individual to be subjected to a constitutional deprivation.  See Martinez, 697 F.3d at 1255.

But at some point, prosecutors and courts become responsible for independently determining whether probable cause justifies the continuing detention of a criminal suspect.  At that point, a police officer may be liable only if he has concealed or misrepresented material facts to those responsible for making such independent determination.  See Galen v. County of Los Angeles, 477 F.3d 652, 663 (9th Cir. 2007).  As the Tenth Circuit explained in Pierce v. Gilchrist, 359 F.3d 1279, 1292 (10th Cir. 2004), "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution they cannot escape liability by pointing to the decisions of prosecutors, or grand jurors, or magistrates to confine or prosecute him.  They cannot hide behind the officials whom they have defrauded." (quoting Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988)).

In this case, Plaintiff has not presented any evidence in proof of his claim that Defendant Meisinger omitted material information from charging documents.  Plaintiff does not even identify that information.  Nor has Plaintiff presented any evidence that Defendant Meisinger otherwise prevented the prosecutor or court from exercising independent judgment regarding Plaintiff's increased bail and continuing detention.  Accordingly, no reasonable

16

jury could find in his favor on the complaint's third claim.

* * *

For the foregoing reasons, Defendants Meisinger and Garcia's motion for summary judgment on the basis of qualified immunity (Doc. #46) is GRANTED IN PART and DENIED IN PART.[3]  Defendants' motion to stay discovery pending resolution of their summary judgment motion (Doc. #47) is DENIED as moot.

Entered for the Court
this 21st day of May, 2013

Bobby R. Baldock
United States Circuit Judge
Sitting by Designation.

_____

[3] Defendant Garcia's motion for summary judgment on Plaintiff's state claims for false arrest and false imprisonment based on a breach of statutory and common law duties under New Mexico law is also GRANTED for lack of proof, while Defendant Meisinger's motion for summary judgment on Plaintiff's state law claims is DENIED.  The federal doctrine of qualified immunity does not apply to state law claims.  See Jenkins v. City of New York, 478 F.3d 76, 86 (2d Cir. 2007) (citing cases).  False arrest or false imprisonment occurs in New Mexico when the "facts available to a detaining officer would not warrant a person of reasonable caution to believe detention appropriate."  Fuerschbach v. Southwest Airlines, Inc., 439 F.3d 1197, 1207 (10th Cir. 2006) (internal quotations and brackets omitted).  Only an officer "possessed of a good faith *and* reasonable belief in the lawfulness of the action is not liable for false imprisonment or false arrest."  Id. (emphasis added).  The Court has already concluded based on the facts presented that a reasonable officer in Defendant Meisinger's position would have known that seizing Plaintiff from his home and arresting him violated his Fourth Amendment rights.

17